Filed 8/22/24  P. v. Hughes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH ALLEN HUGHES,<br><br>    Defendant and Appellant. | F085448<br><br>(Super. Ct. No. VCF358027)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, Lewis A. Martinez, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2006, defendant Joseph Allen Hughes (Hughes) killed his wife, Sonia Hughes (Sonia). On November 18, 2022, Hughes was convicted of second degree murder. On appeal, Hughes argues that the conviction must be reversed because the evidence only supported a finding of heat-of-passion manslaughter. The People disagree.

We reviewed the record and determined there was an issue regarding the trial court's ruling on Hughes's first motion for acquittal. Accordingly, we directed the parties "to file supplemental briefs addressing the following issues: (1) Did the trial court apply the wrong legal standard when it denied [Hughes's] Penal Code section 1118[1] motion after the prosecution's case-in-chief? (2) If the trial court applied the wrong standard, was the error harmless? (3) If the trial court erred and the error was not harmless, what is the appropriate remedy?"

In their supplemental briefing, the parties agree that there was error but disagree as to whether the error was harmless and the appropriate remedy.

Substantial evidence supports the conviction. However, we conditionally reverse the judgment and remand with directions for the trial court to reconsider Hughes's first section 1118 motion using the correct standard.

## PROCEDURAL HISTORY

On October 28, 2022, the Tulare County District Attorney filed an amended information charging Hughes with the murder of Sonia Hughes (§ 187, subd. (a); count 1).

Hughes waived his right to a jury trial, and a court trial was held. After the prosecution's case-in-chief, Hughes made an oral motion for acquittal pursuant to section 1118. The motion was denied. Hughes then waived the statute of limitations for

---

[1] All further undesignated statutory references are to the Penal Code.

2.

voluntary manslaughter.  After Hughes rested, he renewed his motion for acquittal.  The motion was denied.

On November 18, 2022, the trial court found Hughes guilty of second degree murder.  On December 16, 2022, the trial court sentenced Hughes to 15 years to life.

On December 16, 2022, Hughes filed a notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

On November 25, 2006, Sonia's partially buried remains were discovered on the bank of a dry creek.  The Tulare County Sheriff's Office excavated Sonia's remains.  A detective with the sheriff's office found that pajama bottoms were tied in a knot around Sonia's neck, although he was unable to determine how tightly it had been tied.

On November 30, 2006, Curtis Brown, a detective with the Visalia Police Department, went to Hughes's house.  Brown informed Hughes that his wife's remains were found.  Hughes did not show any emotion.

Hughes told Brown that his wife left with a black bag and a white plastic bag about a week and a half after Hughes got out of jail.  He had last seen her around October 1, 2006.  He believed that his wife was with a man named S.R., and that his wife was in a relationship with this man.

Hughes also told Brown that he was aware of potential infidelity while he was in jail, but he and Sonia were still married and had agreed to remain friends for the kids.  After he got out of jail, he and Sonia started getting along, remained intimate, and were attempting to work on their issues.  However, Sonia was heavily using narcotics and wanted Hughes to do drugs with her.  She had also sold items from Hughes's house.

Hughes also told Brown that he talked to the police about his wife leaving around five days after she left.  Brown reviewed Visalia Police Department records and

confirmed that on October 6, 2006, Hughes placed a call for service and police went to his house.

Hughes also told Brown that he had a live-in girlfriend, and that they had been together for a few weeks.

On December 1, 2006, Brown searched Hughes's residence. Brown seized a shoebox full of documents. One of the documents was a letter postmarked September 26, 2006. Hughes wrote the letter to Sonia while he was still in jail. Hughes wrote, "Here's your bracelet, Sonia. No reason for me to wear it …, you don't love me."

Brown also located a burn barrel. There was no fire, but there was ash inside, as well as items that had not been completely burned. Brown located women's clothing, as well as what looked like wedding photographs with Sonia and Hughes.

On or around February 20, 2016, one of Hughes's sons, Doe 1, came into the police station to provide a statement. Doe 1 first provided his statement to Officer Lamar. On February 22, 2016, Doe 1 provided his statement to Celestina Sanchez, a detective with the Visalia Police Department. After receiving the statement, Sanchez began conducting further investigations.

On March 1, 2016, Sanchez interviewed Hughes. Hughes "was very angry," and he stated that he also wanted to know who murdered Sonia. Sanchez asked Hughes if he would give a statement, and Hughes told her that he would only tell her the story once.

Hughes told Sanchez that, while he was in jail, he was informed that Sonia was using narcotics and being unfaithful. So, he sent word to Sonia telling her to stop. After he was released, he went home. He saw that Sonia was wearing short skirts and high heels. Hughes believed she was doing this because she was using narcotics, and possibly because she was prostituting herself and spending time with prostitutes.

Hughes also told Sanchez that a black man and a black woman came to his residence. They had a conversation with Sonia. Sonia then asked Hughes to do some

4.

side work to make money. Hughes believed Sonia wanted the money for narcotics, and Sonia got upset when Hughes was not able to make as much money as Sonia wanted. Sonia left and never returned. Hughes believed that Sonia had left with the black man and black woman.

Sanchez did not tell Hughes that Doe 1 had made a statement. However, as Sanchez continued investigating, Sonia's sister, G.G., provided Sanchez with a letter written by Hughes to one of his daughters, Doe 2. The letter included an envelope, which was postmarked August 22, 2016. The letter mentioned that Doe 1 had come forward with an additional piece of information.

Sonia's sister, G.G., testified at trial. According to G.G., after she found out that Sonia was no longer at Hughes's residence, she talked to Hughes. Hughes told her that Sonia had left with someone because Hughes found out what Sonia was doing while he was in jail. G.G. also testified that Hughes told her he had cheated on Sonia, and that Sonia had found out.

Hughes's son, Doe 1, testified at trial. He was 12 at the time of the incident.

According to Doe 1, Hughes was released from jail in September of 2006. Hughes came home in the evening. Sonia (Doe 1's mother) was home that evening, as were Doe 1's three siblings. Sonia was wearing a pajama shirt and pajama bottoms.

At first, Hughes and Sonia were saying that they missed each other, and Hughes hugged Sonia. They started arguing at around 9:00 p.m., although Doe 1 did not remember how the argument started.[2] They argued about Sonia cheating on Hughes. Sonia apologized a few times for cheating. She also admitted that she was using drugs. More than once she told Hughes that the men she cheated with had a bigger penis than

---

[2] Doe 1's testimony was not entirely consistent regarding the timeline of events.

Hughes, which upset Hughes.  Hughes called Sonia the "B word and … a cheater and stuff like that."

Eventually, Hughes and Sonia walked from the living room to their bedroom.  Doe 1 heard Hughes and Sonia engaging in sexual intercourse.  Doe 1 heard them arguing before, during, and after they engaged in sexual intercourse, but he could not understand what they were saying.

After Hughes and Sonia were in the bedroom for about 30 to 40 minutes, Doe 1 saw Hughes drag Sonia by her hair from her bedroom to the kitchen, and then to the living room.  Hughes then pushed Sonia against the wall and started hitting her.  Sonia asked Hughes to stop as he was dragging her and as he was hitting her.  Doe 1 believed the physical fighting started over Sonia cheating and comparing Hughes to other men.

When Hughes pushed Sonia against the wall, Doe 1 walked out of his room.  Both Sonia and Hughes were bleeding.  Hughes told Doe 1 to "Go to your room or I'm gonna beat you're a[**]," and Doe 1 went back to his room.  Doe 1 left the door cracked open, but Hughes closed it, and Doe 1 was too scared to reopen it.  However, he did crack it open again.

At some point Doe 1 shut his door and tried watching from underneath it, but he could not see anything.  However, he heard physical fighting, and then what sounded like someone hitting the ground.  Sonia then called for Doe 1's help and told him to call 911.  Sonia called for help for about 30 seconds to a minute.  Doe 1 could hear her choking.  Her voice was loud at first, but it got quieter as time went on, and eventually the calls for help stopped.  Doe 1 did not hear any other words or sounds from his mother.

After the calls for help stopped, Doe 1 heard what sounded like Sonia being pulled into the garage.  Hughes then came to Doe 1's room and said he was going to get groceries.  Hughes left in a car 15 minutes later.

After Hughes left, Doe 1 looked around the house. He saw drops of blood and his mother's hair in the living room and the hallway. He also saw a smeared bloody handprint on the wall, like someone had been pulled. Doe 1 did not see Sonia, and he never saw her again.

When Hughes came back, Doe 1 saw that his shirt had what looked like blood on it. Hughes told Doe 1 it was tomato sauce, but Hughes talked about burning the shirt.

Doe 1 walked to school the day after the incident. When he got home, the house was clean and the blood was gone. Additionally, Hughes sold the car within a week.

Doe 1 gave a statement to the police in 2006 regarding what he had seen that night. Doe 1 initially testified that he was honest with the police in 2006, but later testified that he told the police that Sonia left on her own because he was scared of Hughes.

Sanchez interviewed Hughes again on November 14, 2017. Initially, Hughes denied killing Sonia. Eventually, Hughes stated that Sonia told him that she started smoking crack, was "f[***]ing around with [a] black guy," and was doing "tricks." About a week after Hughes got released from jail, Sonia and Hughes got into an argument. Hughes "blew up." He hit Sonia several times and knocked her down. Sonia tried to go to the garage, but Hughes pulled her back and then pushed her. Sonia slipped and fell, and Hughes fell on top of her. His hands landed on her neck, and something "broke." Hughes did not mean to kill her. While his "instinct" was to strangle Sonia, he did not.

On July 24, 2019, Sanchez spoke to Doe 2, one of Hughes's daughters. Doe 2 played a recording of a phone call from Hughes. On the call, Hughes stated that approximately one week after he was released from jail, he was arguing with Sonia. The argument turned physical, Hughes accidently hit Sonia in the throat, something broke, and Sonia died.

R.P., who met Hughes "a long time ago," testified at trial. According to R.P., Hughes told R.P. that he believed Sonia cheated on him while he was in jail. Hughes also told R.P. that Sonia told him she was trading sexual intercourse for drugs. Hughes was "extremely" upset about that.

R.M., who was Hughes's friend before Sonia went missing, testified at trial. According to R.M., she and Hughes got into an argument in 2010. Hughes pushed R.M. to the ground and said to her, "don't end up like the last b[***]h." R.M. thought Hughes was referring to Sonia.

Multiple witnesses testified that Hughes had a short temper.

**Hughes's Case**

The defense recalled Doe 1. Doe 1 testified that he heard Sonia and Hughes fighting on the night Hughes was released from jail. Sonia told Hughes that she not only cheated with S.R., but also with a black man. Hughes asked if the black man had a bigger penis, and Sonia told him that the black man's penis " 'was a little bit bigger and longer.' " Sonia also told Hughes that the black man was " 'a little bit better.' " They had this same argument before and after Sonia and Hughes had sex. The argument was heated the entire time.

Doe 1 also testified that during the argument that occurred after Hughes and Sonia engaged in sexual intercourse, Hughes got angry and yelled at Sonia. Hughes called Sonia "a B word." Hughes also stated, " 'You f[***]in' b[***]h, you're a ho.' " Hughes also stated, " 'I got arrested, I come out and I find this out, that this is happening.' " Right after Doe 1 heard the comments about the black man's penis during this second argument, Doe 1 heard Sonia and Hughes physically fighting again, and the fighting got nasty. Overall, the entire incident lasted "pretty much the whole night."

Doe 2, one of Hughes's daughters, testified at trial. According to Doe 2, she was six years old on the night her mom, Sonia, was killed. It happened on the night Hughes

was released from jail.  Sonia and Hughes argued frequently, so Doe 2 could not remember if she heard them arguing the night Sonia was killed or a different night.  At some point Doe 2 saw Sonia and Hughes hitting each other, and they both fell down.  Doe 2 also saw Sonia kicking Hughes.  At some point Doe 2 also saw a man climb through the window into Sonia's bedroom.

Sanchez interviewed Doe 2 on March 3, 2016.  Doe 2 told Sanchez that on the night Hughes was released from jail, Sonia and Hughes argued and fought.  Sonia and Hughes were hitting each other.  At some point Hughes fell, and Sonia kicked him.  Doe 2 had never seen her parents physically fight like that before.  Eventually Sonia exited the residence and tried to get Doe 2 and her siblings in the car.  However, they were brought back into the house.  This happened on the night Sonia was killed.

Hughes testified at trial.  According to Hughes, he was released from jail in September of 2006.  On the night he was released, after the children went to bed, Sonia and Hughes went into "the room."  Hughes noticed that a lot of his things were missing.  Sonia told Hughes she had to pay bills, and then they started arguing about Sonia's drug use.  Sonia told Hughes that she cheated on him with S.R. and it was Hughes's fault for leaving her.  At some point Hughes slapped Sonia.  Hughes eventually realized that Sonia was right, and he "kinda settled down."  Hughes and Sonia did not have sexual intercourse that night.

Over the next few days, Hughes helped Sonia stay sober.  On the fifth day after Hughes was released from jail, Sonia was agitated and told Hughes that she needed to get high.  She started arguing with Hughes.  Sonia mocked Hughes's chest deformity by stating that it felt good to put her hand on a man's chest.  Sonia knew that Hughes had been teased because of this deformity.  Sonia also said that the other man's penis was bigger too.

Hughes asked Sonia if she was referring to S.R., and Sonia said she was referring to a black man named A.C. Sonia told Hughes that A.C.'s "dick was … bigger, longer, and he was a little bit better." Sonia also told Hughes that she had sexual intercourse with A.C. after Hughes was released from jail.

At that point, Hughes hit Sonia twice. Sonia picked up a rolling pin and threw it at Hughes. The rolling pin missed Hughes and broke the window. Sonia yelled for Doe 1 to help her, and Doe 1 came out of his room. Hughes told Doe 1 to get back in his room, and he did. Hughes then hit Sonia again and "busted her lip pretty good."

Sonia put her hand on the wall and opened the door to the garage. Hughes grabbed her and threw her backwards. Hughes was "in a rage" and wanted to strangle Sonia. Hughes moved towards Sonia, his foot hit her foot, and he fell. As he fell he put his hands together, and they landed on Sonia's neck. When Hughes got off Sonia, he heard a "gush of air come out."

Hughes told Sonia to get up, but she did not move. Eventually, Hughes moved Sonia's body to the car and drove to an isolated area. As Hughes was dragging Sonia's body, her pajama bottoms ripped and came off. As Hughes was burying Sonia's body, he put the pajama bottoms on her face. He did not tie the pajama bottoms around Sonia's neck.

Hughes and Sonia did not have sexual intercourse either before or after the fight.

When Hughes was in jail, he did not know that Sonia was cheating on him. He wrote the letter to Sonia saying that she did not love him because she did not visit him for two weeks.

Allen Hedberg, a clinical psychologist, testified at trial. Dr. Hedberg interviewed Hughes and reviewed Hughes's jail medical records. According to Dr. Hedberg, Hughes had bipolar disorder with both manic states and depression. Hughes had not received adequate treatment. One characteristic of bipolar disorder is that there will be times of

aggressiveness, and Hughes had this characteristic. Additionally, during the manic state of bipolar disorder, a person is likely to become agitated and overreact.

**The Prosecution's Rebuttal**

J.M., a former friend of Hughes's, testified at trial. When J.M. and Hughes first met, which was approximately four years before Sonia went missing, Hughes told J.M. that if he ever found out that Sonia cheated, he would kill her. However, J.M. thought Hughes was joking. Additionally, they were under the influence of methamphetamine when Hughes made the comment.

In a letter Sonia wrote to S.R. on the back of a receipt that was dated September 23, 2006, Sonia told S.R. that "Joe's out today," that she was scared, and to "[d]eny it."

## DISCUSSION

### I.    Substantial Evidence Supports the Conviction

#### A.  The Trial Court's Verdict

The trial court, acting as the finder of fact, reviewed the parties' briefs and heard their arguments. The trial court found that Hughes learned of Sonia's infidelity while he was in jail. The trial court also found that Hughes's credibility was "severely impaired," while Doe 1's testimony was "alarmingly credible."

The trial court further found as follows:

> "[W]hen [Hughes] was released from custody, he confronted the victim about what she had been doing when he was in custody. He assaulted her by his own admission. He then moved on, forgave her for it, and he did cool down.
>
> "It was days later that the fatal attack occurred. That's what I find. I think that is borne out by the weight of the evidence here; that this did not happen on the night he was released from custody.
>
> "I do not find sufficient provocation to negate malice here. The statement by [Hughes] that the victim was taunting him with this report that she had slept with A.C. that day specifically to get back at him I find not credible at all.

"His statement that she was taunting him about his chest deformity I find to be not credible at all. These were all late decisions to the story by [Hughes] that were made here on the stand. He has admitted lying about this case repeatedly over the course of many years.

"These statements I think are not corroborated by [Doe 1], and I just do not find it plausible that the victim would have acted in this way at that moment. I do not find it believable that she would have engaged in that type of behavior under those circumstances. I think she would have known full well that it would have provoked an overwhelmingly violent response. She had just been assaulted by him after he was released from custody over the infidelity.

"I think it is beyond safe to assume that she was familiar with his volatility, his short temper.

"[Doe 1] indicated that during the argument that preceded her killing immediately that she was apologetic, that it was [Hughes] who was the one who was bringing up these issues of infidelity. I think she was in an impossible situation at that moment, and I do not find it believable by a long stretch that she would have been taunting him in that way.

"In other words, I believe [Hughes] picked this fight, and the victim really had no good options available to her. I think he certainly was angry, but I think he made a decision to kill Sonia, and he acted on that decision. So malice is not negated."

Finally, the court found that "the evidence establishes beyond a reasonable doubt that [Hughes] intentionally killed [Sonia]," but it could not "conclude beyond a reasonable doubt this was something more than a decision rashly made on his part." Accordingly, the court found Hughes guilty of second degree murder.

### B. Applicable Law

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. Malice is express when the defendant intends to kill the victim. (§188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114-1115.) Implied malice has " ' "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences

12.

of which are dangerous to life.' [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.' " ' "  (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

"All murder that is perpetrated by … [a] willful, deliberate, and premeditated killing … is murder of the first degree."  (§ 189, subd. (a).)  As relevant here, "[a]ll other kinds of murder are of the second degree."  (§ 189, subd. (b).)

"Voluntary '[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice.…  Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter:  heat of passion and unreasonable self-defense.' " (*People v. Soto*, *supra*, 4 Cal.5th at p. 974.)

"A heat of passion theory of manslaughter has both an objective and a subjective component."  (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  The provocation must, from an objective standpoint, be such as would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 950, 957 (*Beltran*).)  In other words, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment."  (*People v. Lee* (1999) 20 Cal.4th 47, 60.)  Additionally, "the victim must taunt the defendant or otherwise initiate the provocation."  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

As to the subjective component, the defendant must have actually acted in the heat of passion.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  " '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]' [Citations.]  Thus, it is insufficient that one is provoked and later kills.  If sufficient time has elapsed for one's passions to

'cool off' and for judgment to be restored, [the provocation] provides no mitigation for a subsequent killing." (*Beltran*, *supra*, 56 Cal.4th at p. 951.)

### C. Standard of Review

When evaluating a sufficiency of evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The test for evaluating a sufficiency of evidence claim is deferential." (*People v. Flores* (2020) 9 Cal.5th 371, 411.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "We must also 'accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

### D. Analysis

Hughes argues that there was insufficient evidence to support the verdict. According to Hughes, the prosecution failed to prove beyond a reasonable doubt that Hughes did not kill Sonia in the heat of passion. Hughes does not challenge the trial court's findings regarding his credibility. Instead, he argues that, "based on [Doe 1's] testimony alone, sufficient provocation to establish manslaughter was established, uncontradicted by any other evidence based on which a reasonable trier of fact could have rejected this evidence in favor of a murder finding." According to Hughes, Doe 1 "described a sexual taunt as the catalyst for the argument, and one that was of a sufficiently raw and cutting character as to be unequivocally adequate to satisfy the objective requirements for a heat-of-passion theory."

Hughes's argument is not persuasive.  There is substantial evidence from which a reasonable trier of fact could find that Hughes did not kill Sonia in the heat of passion because Sonia did not taunt Hughes or otherwise initiate the provocation.[3]

Hughes knew Sonia had cheated days before he killed her (or longer).  Additionally, Doe 1 testified that on the day Hughes killed Sonia, Sonia apologized for cheating multiple times.  Doe 1 also testified that, rather than taunting Hughes about A.C.'s penis size, it was Hughes who asked about it and Sonia was answering his question.  Further, Sonia's choice of language suggests that she was not insulting or otherwise taunting Hughes.  According to Doe 1, Sonia stated that A.C.'s penis was "*a little bit* bigger and longer" and "*a little bit* better."  (Italics added.)  Thus, there is evidence that is reasonable, credible, and of solid value that Sonia was not taunting Hughes or otherwise flaunting her infidelity, but instead apologizing and answering Hughes's questions.

In addition to the above, there is circumstantial evidence that Sonia would not have flaunted her infidelity or "sexual[ly] taunt[ed]" Hughes because, as noted by the trial court, she "would have known full well that it would have provoked an overwhelmingly violent response."  (See *People v. Flores*, *supra*, 9 Cal.5th 371, 411

---

[3]  Hughes does not argue that Sonia's infidelity was itself sufficient to cause Hughes to act in the heat of passion.  Nor would we find it to be.  As the trial court found, there is evidence that Hughes knew of Sonia's infidelity while he was still in jail.  There is also evidence that on the day Hughes was released from jail, he discussed Sonia's infidelity with her.  According to Hughes, he did not kill Sonia until approximately four days after that discussion.  In fact, Hughes testified that he did cool off.  According to Hughes, on the night he was released from jail, Sonia told Hughes it was his fault that she cheated.  Hughes eventually realized that Sonia was right and "kinda settled down."  Thus, substantial evidence supports a finding that there was sufficient time for Hughes to cool off and for his reason to be restored after he found out about Sonia's infidelity.

To the extent Hughes argues that the provocation consisted of a combination of Sonia's infidelity and her taunts, the argument fails because, as discussed in this opinion, substantial evidence supports a finding that Sonia did not taunt Hughes.

["We must … 'accept logical inferences that the jury might have drawn from the circumstantial evidence' "].) Hughes testified that he and Sonia were together for 12 years, and multiple witnesses testified that Hughes had a short temper. Additionally, Doe 2 testified that Sonia and Hughes argued a lot, and the arguments were mostly started by Hughes. Further, Hughes admitted that on the day he was released from jail he hit Sonia. Finally, Sonia wrote a letter to S.R., a man she cheated with, stating that "Joe's out today," that she was scared, and to "[d]eny it."

Accordingly, there is substantial evidence from which a reasonable trier of fact could conclude, beyond a reasonable doubt, that Hughes did not kill Sonia in the heat of passion because Sonia did not taunt Hughes or otherwise initiate the provocation. (*People v. Carasi*, *supra*, 44 Cal.4th at p. 1306.) [for heat of passion to negate malice, "the victim must taunt the defendant or otherwise initiate the provocation"].)

In arguing otherwise Hughes relies on two cases, *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*) and *People v. Bridgehouse* (1956) 47 Cal.2nd 406 (*Bridgehouse*), abrogated on another ground by *People v. Lasko* (2000) 23 Cal.4th 101, 110.[4]

In *Berry*, the defendant's wife (the victim) went on a trip and returned on July 13. (*Berry*, *supra*, 18 Cal.3d at p. 512.) The defendant testified that when she returned, she told the defendant she fell in love with another man, that they had sexual intercourse, and that she wanted a divorce. (*Id.* at p. 513.) "Thus commenced a tormenting two weeks in which [the victim] alternately taunted [the] defendant with her involvement with [another

_____

[4] Hughes also argues that the trial court "relied heavily" on Hughes's lies in finding that heat of passion did not negate malice. However, Hughes's argument is not based on a fair reading of the record. While the trial court did reject testimony from Hughes as not credible, this was not the basis of finding Hughes guilty of second degree murder instead of voluntary manslaughter. Instead, the trial relied on a cooling off period and the lack of provocation.

man] and at the same time sexually excited [the] defendant, indicating her desire to remain with him." (*Ibid*.)

"On the evening of July 22d [the] defendant and [the victim] went to a movie where they engaged in heavy petting. When they returned home and got into bed, [the victim] announced that she had intended to make love with defendant, 'But I am saving myself for this [other man], so I don't think I will.' [The] [d]efendant got out of bed and prepared to leave the apartment whereupon [the victim] screamed and yelled at him. [The] [d]efendant choked her into unconsciousness." (*Berry*, *supra*, 18 Cal.3d at pp. 513-514.) He later called a taxi to take the victim to the hospital and left the apartment. (*Id.* at 514.)

Three days later the defendant returned to the apartment to talk to the victim. (*Berry*, *supra*, 18 Cal.3d at p. 514). The victim was not there, and the defendant stayed overnight. (*Ibid.*) The victim came back the in the morning. (*Ibid.*) "Upon seeing [the] defendant there, she said, 'I suppose you have come here to kill me.' [The] [d]efendant responded, 'yes,' changed his response to 'no,' and then again to 'yes,' and finally stated 'I have really come to talk to you.' [The victim] began screaming. [The] [d]efendant grabbed her by the shoulder and tried to stop her screaming. She continued. They struggled and finally [the] defendant strangled her with a telephone cord." (*Ibid.*) The *Berry* court held that the defendant was entitled to a heat-of-passion manslaughter instruction. (*Id*. at p. 512.)

While there are arguably some factual similarities between *Berry* and this case, there are material differences. The most important being that substantial evidence supports a finding that Sonia did not taunt Hughes, whereas in *Berry*, there was evidence of taunting over a long period of time. (*Berry*, *supra*, 18 Cal.3d at p. 516.) In addition to the factual differences, the legal issue presented in *Berry* is materially different as well. In *Berry*, the issue was whether the defendant "was entitled to an *instruction* on voluntary

manslaughter." (*Berry*, *supra*, 18 Cal.3d at p. 512, italics added.) Here, heat-of-passion manslaughter was considered and rejected by the trial court acting as finder of fact, and Hughes is arguing that insufficient evidence supports the verdict. Accordingly, *Berry* is distinguishable.

In *Bridgehouse*, the defendant's wife had an affair with the victim for "well over a year," and the defendant discussed the affair with his wife. (*Bridgehouse*, *supra*, 47 Cal.2d at p. 407.) Additionally, the defendant worked two jobs, and his wife told him that she was seeing the victim "at the family home, and other places," while the defendant was at work. (*Id.* at p. 408.) The defendant eventually filed for divorce. Several months later, the defendant filed for a restraining order to prohibit his wife from associating with the victim "in the presence of the parties' minor child." (*Ibid.*). However, the defendant still hoped to reconcile with his wife. (*Id.* at p. 411.)

After receiving the request for a restraining order, the defendant's wife "told him that she would fight his divorce action and would not hesitate to lie or use any other methods in so doing; that she would kill him if he tried to take the children away from her." (*Bridgehouse*, *supra*, 47 Cal.2d at p. 408.) The next day, the defendant took their small son to his mother-in-law's house. (*Id.* at p. 409.) The defendant saw the victim sitting in the den, reading. (*Ibid.*) The defendant was then told that his son was getting out of the car, so the defendant left the house and put his son back in the car. (*Ibid.*) After returning to the house, the defendant was told that his son was getting out of the car again, and the defendant brought him into the house. (*Ibid.*) After that, the defendant shot at the victim five or six times. (*Ibid.*)

The *Bridgehouse* court found that insufficient evidence supported the defendant's second degree murder conviction and reduced it to voluntary manslaughter. (*Bridgehouse*, *supra*, 47 Cal.2d at p. 413-414.)

The facts of the case before us are not similar to those in *Bridgehouse*. In contrast to the defendant's wife's conduct in *Bridgehouse*, there is no evidence that Sonia cheated on Hughes "for well over a year," or that Sonia cheated on Hughes at the family home while Hughes was away because he was working two jobs. Additionally, in *Bridgehouse* the affair was ongoing, whereas here, a finder of fact could reasonably reject Hughes's testimony that Sonia cheated on him again after he was released (which the trial court did). Finally, as discussed above, there is evidence that is reasonable, credible, and of solid value that Sonia was apologetic about cheating and answering Hughes's questions about the affair. The trial court reasonably concluded Sonia did not taunt Hughes, threaten Hughes, or flaunt her infidelity. Accordingly, *Bridgehouse* is readily distinguishable.

Given the differences between this case and the cases relied upon by Hughes, we see no reason to deviate from the general rule that " 'it is not a matter of law but a matter of fact for the [trier of fact] in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions and so lessen the degree of the offense by relieving it from the element of malice.' " (*Beltran*, *supra*, 56 Cal.4th at pp. 950-951; see also *People v. Wright* (2015) 242 Cal.App.4th 1461, 1490 ["basic questions about the existence of provocation and its effect, if any, upon the defendant's mind … is a question of fact for the jury"].)

Based on the foregoing, substantial evidence supports the conviction and Hughes's claim fails.[5]

---

[5] Hughes also argues that, as the same evidentiary deficiency existed when Hughes first made his motion for acquittal, which was before he waived the statute of limitations for voluntary manslaughter, the appropriate remedy is to reverse the conviction in full. As we find that substantial evidence supports the verdict, we do not

## II. The Trial Court Applied the Wrong Standard When Ruling on Hughes's Motion for Judgment of Acquittal and This Error Was Not Harmless

### A. Additional Background

After the prosecution's case-in-chief, Hughes made a section 1118 motion for judgment of acquittal. Hughes argued that there was no evidence of premeditation or malice.

The trial court began ruling on the motion, stating,

> "Much of this evidence related to the infidelity and the drug use, and so forth, I think can cut either way. On the one hand, it can be argued as provocation by the defense. On the other, it can be argued as motive that built up over time for [Hughes] to kill the victim in cold -- or at least not hot blood.

> "The question when it comes to an 1118.1 motion is would there be evidence sufficient to sustain the verdict on appeal at this point, and I think of it as if there was a jury right there, would I give this case to them to deliberate on the question of murder? The thinking is would the record thus far be enough to sustain a verdict on appeal, and I think essentially the answer is yes, I would do that. The jury can look at these things in more than one way. They could potentially decide that it was a heat-of-passion issue. They could also look at it in a different way and decide that this was an act of retribution for punishment."

---

address what remedy would apply if Hughes had prevailed on his sufficiency of the evidence claim.

To the extent Hughes intended this argument to include a separate sufficiency of the evidence challenge to the denial of his motion for acquittal, this argument has been forfeited. (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 949 [when a party fails to present argument on an issue, the party forfeits that issue on appeal]; *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].) Instead of developing a separate argument with a separate heading, in a section related to the appropriate remedy Hughes avers that "the evidence before the court at the close of the prosecution's case was not substantially different from the evidence before the court after full presentation of the case." We do not agree. At least some of the evidence that both we and the trial court relied upon was introduced after the prosecution's case-in-chief. Moreover, Hughes does not separately analyze only the evidence introduced during the prosecution's case-in-chief or explain why that evidence is insufficient.

Hughes interjected, stating "[b]ut that's not reasonable doubt."

The trial court responded,

> "I'm the jury in this particular case. I haven't made up my mind, but I think that -- in other words, there's enough evidence here for me to make a decision choosing between those options. Potentially, at least, depending on what the defense decides to do with regards to the statute of limitations on manslaughter. So, in other words, I think there's enough evidence in the record to sustain a murder conviction on appeal. So the 1118.1 motion is denied."

After the motion was denied, Hughes waived the statute of limitations for voluntary manslaughter and additional evidence was presented. Ultimately, the trial court found Hughes guilty of second degree murder.

### B. Applicable Law

Section 1118 provides: "In a case tried by the court without a jury, a jury having been waived, the court on motion of the defendant or on its own motion shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading after the evidence of the prosecution has been closed if the court, upon weighing the evidence then before it, finds the defendant not guilty of such offense or offenses."

Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

"The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom,

21.

there is any substantial evidence of the existence of each element of the offense charged.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13.)

### C.  Analysis

The parties agree, as do we, that the trial court applied the wrong standard when ruling on Hughes's motion for judgment of acquittal.  In its ruling, the trial court specifically referenced section 1118.1, as well as the substantial evidence standard it provides.  It also stated that the evidence could "cut either way," and that it "ha[d]en't made up [its] mind."

Accordingly, the record is clear that the trial court intentionally declined to evaluate the evidence as the trier of fact and instead applied the substantial evidence standard from section 1118.1.  As this case was tried by a court without a jury, this was error.  The trial court should have applied section 1118, which required it "to weigh the evidence, evaluate the credibility of witnesses, and determine that the case against the defendant [was] 'proved beyond a reasonable doubt before [the defendant] [was] required to put on a defense.' " (*In re Andre G.* (1989) 210 Cal.App.3d 62, 66, quoting *People v. Partner* (1986) 180 Cal.App.3d 178, 183.)

This is where the parties' agreement ends.  Hughes argues that the error was not harmless and the appropriate remedy is directing the entry of a judgment of acquittal. The People argue that the error was harmless, and that if it was not, the appropriate remedy is remanding the matter for the trial court to rule on the motion using the correct standard.

We agree with Hughes that the error was not harmless, but we agree with the People as to the appropriate remedy.

The People argue that the error was harmless "because the record establishes that appellant's motion would have been denied even if the correct standard was applied."

First, the People rely on *People v. Norwood* (1972) 26 Cal.App.3d 148, 159 (*Norwood*) for the proposition that the trial court need not grant a motion for acquittal " ' "where the evidence presented by the People is sufficient to sustain a conviction, when it is presumed that any permissible inference pointing toward guilt was made by the court and that every question of fact was resolved in favor of guilt." ' " The People argue that, as there was sufficient evidence to sustain a conviction, the error was harmless under this standard.

To begin, we note that the *Norwood* court quoted *People v. Brown* (1969) 1 Cal.App.3d 161 (*Brown*) for this proposition (*Norwood*, *supra*, 26 Cal.App.3d at pp. 158-160). However, the *Brown* court did not cite anything in support. (*Brown*, at p. 166.) Additionally, neither court provided any analysis as to why this is the appropriate rule. Moreover, in affirming the denial of the motion for judgment of acquittal, both courts stated that the issue was factual and deferred to presumed factual findings. (*Norwood*, at pp. 158-160; *Brown*, at p. 166.) Neither court stated that it found error or that it was conducting a harmless error review. (*Norwood*, at pp. 158-160; *Brown*, at p. 166) Accordingly, both courts were conducting a substantial evidence review of the trial court's decision, and both courts found that there was no error.

Given the issue before these courts, it does not appear that either intended to hold that, despite section 1118's clear language, a trial court may deny a section 1118 motion for acquittal by applying the substantial evidence standard instead. (See *People v. Casper* (2004) 33 Cal.4th 38, 43 ["It is axiomatic that cases are not authority for propositions not considered"].)

To the extent the courts in *Brown* and *Norwood* did intend to create such a rule, we disagree with it. That rule essentially mirrors the substantial evidence standard laid out in section 1118.1. (See *People v. Crittenden*, *supra*, 9 Cal.4th 83, 139, fn. 13.) However, the standard laid out in section 1118 is different. It requires the trial court "to weigh the

evidence, evaluate the credibility of witnesses, and determine that the case against the defendant is 'proved beyond a reasonable doubt before [the defendant] is required to put on a defense.' " (*In re Andre G.*, *supra*, 210 Cal.App.3d at p. 66.)  Nothing in the statutory language suggests that a trial court is permitted to ignore this standard and to instead utilize the substantial evidence standard in section 1118.1.

Next, the People argue that denials of motions for acquittal are reviewed under the substantial evidence standard.  However, the People do not cite a single case suggesting that substantial evidence is the appropriate harmlessness standard where, as here, a trial court fails to weigh the evidence as finder of fact.  The People do cite two cases that involved section 1118, but neither are on point.  In both, the defendant raised a substantial evidence challenge.  (*People v. Ringo* (2005) 134 Cal.App.4th 870, 880; *People v. Ceja* (1988) 205 Cal.App.3d 1296, 1300-1302.)  Neither case involved a question as to whether the trial court applied the correct standard, and neither case involved a harmless error review.  (*Ringo*, at pp. 880-881; *Ceja*, at pp. 1300-1304.)  Accordingly, neither case is on point for the question now before us, which is not whether the trial court erred (it did), but whether the error was harmless.  (*People v. Casper*, *supra*, 33 Cal.4th at p. 43 ["It is axiomatic that cases are not authority for propositions not considered"].)[6]

Finally, the People argue that the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) applies, and that the error was harmless under this standard.[7]

---

[6] As the trial court intentionally declined to make factual findings, there are no factual findings, explicit or otherwise, to which we can defer.  Moreover, as discussed below, it is reasonably probable that, had the trial court applied the correct standard, it would have reached a different result.

[7] We need not decide whether *Watson* or some greater standard applies because, even assuming the People are correct that the *Watson* standard applies, the error was not harmless.

Under the *Watson* standard, reversal is not required unless it is reasonably probable that Hughes would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.). Applying this standard, we find that the error was not harmless.

First, the trial court's explanation for why it denied the motion for acquittal does not suggest that it would have reached the same result had it weighed the evidence as the fact finder. In ruling on the motion, the trial court stated that the evidence could "cut either way," and that it "ha[d]en't made up [its] mind."

Second, during the prosecution's case-in-chief, Doe 1, the only percipient witness, testified that Hughes and Sonia argued about Sonia cheating on Hughes. During this argument, Doe 1 heard Sonia tell Hughes more than once that the men she cheated with "had a bigger penis than [him]." Doe 1 could tell that this upset Hughes. Moreover Doe 1 testified that he believed that the physical fighting, which ended with Doe 1 hearing Sonia choking, started over Sonia cheating and comparing Hughes to other men. The prosecution also called multiple witnesses to testify that Hughes had a short temper.

Thus, even before Hughes presented his case, there was evidence that the killing was not premeditated and that he acted in the heat of passion. And in the end, the trial court found Hughes not guilty of first degree murder (and based on our review of the record, the evidence presented by Hughes was not particularly strong).[8]

Finally, multiple pieces of evidence unfavorable to Hughes were introduced after the close of the prosecution's case-in-chief. For example, when recalled by Hughes, Doe 1 testified that it was Hughes who asked Sonia about the penis size of a man she cheated with, and Sonia told Hughes it "was a little bit bigger and longer." Doe 1 also testified

---

[8] We note that, when declaring the verdict, the trial court stated that "On balance, based on largely [Doe 1's] testimony, there's a reasonable doubt in my mind as to whether [Hughes] acted with premeditation and deliberation."

that Sonia told Hughes it was "a little bit better." As discussed above, this is evidence that Sonia was not taunting Hughes.

As additional examples, during his testimony Hughes admitted he hit Sonia several days before he killed her. And during its rebuttal, the prosecution introduced a letter Sonia wrote to a man she cheated with that stated that "Joe's out today," that she was scared, and to "[d]eny it." As discussed above, this is circumstantial evidence that Sonia would not have taunted Hughes.

As a final example, during its rebuttal, the prosecution introduced testimony that Hughes told a friend that if Sonia ever cheated, he would kill her.

And not only was unfavorable evidence introduced, the prosecution relied on some of it when making its closing arguments.[9]

Accordingly, it is reasonably probable that had the trial court weighed the evidence as the finder of fact when Hughes first made his motion for judgment of acquittal, Hughes would have obtained a more favorable result.

As we find that the error was not harmless, we next turn to the appropriate remedy. On this, we agree with the People that the appropriate remedy is remanding the matter for the trial court to rule on the motion using the correct standard.

In support of his argument that the appropriate remedy is a judgment of acquittal, Hughes argues that in ruling on the motion, "the trial court pronounced what, in effect, was a not guilty finding of the murder charge." It did this by stating that it had not made up its mind and that there was sufficient evidence for it to choose between the "options." According to Hughes, this means that the trial court, which was the trier of fact, had

---

**9** We note that, in finding Hughes guilty of second degree murder instead of voluntary manslaughter, the trial court also relied on evidence that was introduced after the prosecution's case-in-chief.

reasonable doubt about Hughes's guilt. Thus, Hughes argues that the motion should have been granted and that we should order the entry of a judgment of acquittal.

The problem with this argument is that it assumes the trial court acted as the finder of fact when it made its ruling. While it was supposed to do so, it did not. Instead, it applied the substantial evidence standard from section 1118.1. When applying this standard, "[courts] do not determine the facts [them]selves. Rather, [they] 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Under section 1118.1, "[t]he trial [court] does not weigh the credibility of the prosecution evidence, for that would invade the province of the jury which is the trier of fact." (*People v. Partner*, *supra*, 180 Cal.App.3d at p. 183.)

As Hughes points out, section 1096 defines proof beyond a reasonable doubt as " 'that state of the case, which, *after the entire comparison and consideration of all the evidence*, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (Italics added.) As the trial court intentionally (and erroneously) declined to weigh the evidence as the finder of fact, this comparison and consideration of the evidence did not occur when the trial court ruled on the motion. Given the trial court's failure to weigh the evidence, its ruling in no way suggests what it was ultimately thinking regarding Hughes's guilt, and Hughes's argument fails.

The People's argument, however, is persuasive. As the People point out, our Supreme Court has, in similar circumstances, ordered limited remands. For example, in *People v. Carter* (2024) 15 Cal.5th 1092 (*Carter*), the defendant filed a motion pursuant

27.

to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), as well as a motion to dismiss. (*Carter*, at p. 1095.)  The trial court denied the *Marsden* motion and did not rule on the motion to dismiss.  Subsequently, a trial was held and the defendant was committed as a sexually violent predator.  The defendant appealed, arguing that the "trial court's *Marsden* inquiry was insufficient and requires full reversal of the judgment or, in the alternative, conditional reversal pending reconsideration of his *Marsden* motion and potential litigation of his motion to dismiss."  (*Ibid*.)  Our Supreme Court found that "the trial court conducted an insufficient *Marsden* inquiry and erred in instructing [the defendant] to file his motion to dismiss pro se."  (*Ibid*.)  However, as the error did not necessarily render the judgment invalid, it also found that a full reversal would be premature and that the appropriate remedy was a limited remand for the trial court to correctly address the motions.  (*Id.* at pp. 1095, 1103-1104.)

While not directly on point, we find *Carter*'s guidance helpful.  Similar to the *Carter* court, we do not find that the motion should be granted or that the judgment is necessarily invalid.  Instead, we find only that the trial court applied the wrong standard when ruling on the motion for acquittal and that this error was not harmless. Accordingly, we also find that the appropriate remedy requires a limited remand for the trial court to rule on the motion utilizing the correct standard.

In his supplemental reply brief, Hughes argues that if remand is the appropriate remedy, we should remand the matter to a different judge.  We disagree.

Code of Civil Procedure section 170.1, subdivision (c), provides:  "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."  "An appellate court must exercise its power to disqualify a judge under [this] statute sparingly, and only

when the interests of justice require it." (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1079.)

We see no reason to remand the matter to a different judge. There is nothing in the record that suggests the trial court treated Hughes unfairly or otherwise acted improperly. Instead, the trial court appears to have mistakenly applied the wrong legal standard, likely, at least in part, because the prosecution provided it with the wrong legal standard. "[M]ere judicial error is not conclusive evidence of bias or grounds for disqualification." (*People v. Superior Court (Dorsey)* (1996) 50 Cal.App.4th 1216, 1231.) Moreover, while the trial court heard the evidence in the case and ultimately found Hughes guilty of second degree murder, there is nothing before us that suggests the trial court will be unable to impartially assess the evidence as it stood at the time Hughes first made the motion for acquittal. Thus, there is neither unfairness nor the appearance of unfairness in remanding the matter to the same judge.[10]

Therefore, we find that the appropriate remedy requires a limited remand to the same trial judge to rule on the motion for judgment of acquittal utilizing the correct legal standard. The trial court shall analyze the evidence as it stood at the time the motion was first made. (*People v. Belton* (1979) 23 Cal.3d 516, 526; *People v. Cole* (2004) 33 Cal.4th 1158, 1213.)

### DISPOSITION

The judgment is conditionally reversed and the matter is remanded to the trial court with directions to vacate its order denying Hughes's first motion for acquittal and to reconsider that motion consistent with this opinion.

---

[10] Nothing in this opinion prevents Hughes from requesting disqualification in the trial court, and we take no position on the merits of such a motion. Additionally, as we are remanding the matter to the same judge, we take no position on whether the "re-presentation … of only the evidence originally presented in the prosecution's case in chief" would be required if a different judge hears the matter.

If the trial court denies the motion or grants it only as to first degree murder, it shall reinstate the judgment.  If the trial court grants the motion in full, it shall enter a judgment of acquittal.

SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DESANTOS, J.